IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. CR11-0103 |
| vs. | REPORT AND RECOMMENDATION |
| ALI ABDUL GHANI KHALEEL, | |
| Defendant. | |

## TABLE OF CONTENTS

I.   INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. ISSUE PRESENTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

V.   DISCUSSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.  Did Defendant Give Consent to Search? . . . . . . . . . . . . . . 6
     B.  Was Consent to Search Given Voluntarily? . . . . . . . . . . . . 8
     C.  Was there Probable Cause to Search? . . . . . . . . . . . . . . 11

VI.  RECOMMENDATION  . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## I. INTRODUCTION

On the 25th day of July 2011, this matter came on for hearing on the Motion to Suppress (docket number 14) filed by the Defendant on July 12, 2011. The Government was represented by Special Assistant United States Attorney Daniel Chatham. The Defendant appeared in court and was represented by his attorney, JoAnne Lilledahl.

## II. PROCEDURAL HISTORY

On June 8, 2011, Defendant was charged by Indictment with possession with intent to distribute, and aiding and abetting the possession with intent to distribute, methamphetamine, cocaine, and marijuana. At the initial appearance and arraignment on June 14, Defendant entered a plea of not guilty. Trial was scheduled for August 15, 2011.

On July 12, Defendant timely filed the instant motion to suppress. In addition, Defendant asked that the trial be continued. The request was granted, and the trial is now scheduled for September 19, 2011.

## III. ISSUE PRESENTED

In his motion to suppress, Defendant asserts that a warrantless search of his bags following a traffic stop on April 7, 2011 violated his Fourth Amendment rights. Defendant asks that all evidence obtained as a result of the search, including any statements made by him, be suppressed.

## IV. RELEVANT FACTS

This case arises from a traffic stop on Interstate 80 on April 7, 2011. At approximately 10:05 a.m., Trooper Justin Simmons of the Iowa State Patrol observed a vehicle approaching with a Utah license plate. As the vehicle went by, however, Simmons noticed that the back license plate was "paper tagged," which Simmons thought was unusual. Simmons noticed that the vehicle had dark window tint, and he stopped the vehicle for that reason.[1]

After making the stop, Trooper Simmons approached the vehicle and identified himself to the driver. Simmons noticed that the passenger – who was later identified as Defendant – was leaning back in the seat "like he was taking a nap." Simmons told the driver why he was stopped and then asked both occupants of the vehicle for identification. Defendant presented a Michigan non-drivers identification card. The driver, a Mr. Guzman, produced an "international drivers license."

---

[1] Defendant does not contest the validity of the traffic stop.

As the driver was looking for the vehicle registration, Trooper Simmons looked in the vehicle and observed "a lot of trash." According to Simmons, Defendant was leaning back and "his neck was open." Simmons testified that he could see Defendant's pulse, which was "pounding away in the crook of his neck." Simmons thought that was "really unusual for somebody laying down taking a nap."

Trooper Simmons then asked the driver to come back to the squad car, stating that he would "write you a warning." While in the squad car, Simmons asked the driver where he was going. The driver told Simmons that he was going to Michigan for a job interview in the oil fields. Simmons noted, however, that the driver had not brought along anything so he could stay if offered a job. According to the driver, Defendant was going with him to Michigan "because he knew where they were actually going" and they were both going to look for jobs in the oil field. The driver described Defendant as his friend, whom he had known for a couple of years and had met at school, but he didn't know his name. (Later, the driver said Defendant's name was "Ali something.") The driver told Simmons that he had picked Defendant up at his house in California. After speaking with the driver for a few minutes, Simmons advised the driver that he would write a warning for the tinted windows. After contacting dispatch, however, it was determined that the driver had a suspended driver's license. Accordingly, Simmons decided to issue a citation for that violation.

Trooper Simmons went up to the vehicle to obtain its VIN number. Simmons then approached the passenger side of the vehicle, returned Defendant's identification, and spoke with Defendant. The conversation lasted just over four minutes.[2] In response to questioning, Defendant told Simmons that he had met Defendant at a gas station in Utah. Defendant did not know the driver's name, other than as "Poncho." At the hearing, Simmons testified that based on the inconsistent answers given by the driver and Defendant, he believed there was "criminal activity going on."

---

[2] The conversation was audio-recorded, but the quality of the sound is very poor.

3

Trooper Simmons then returned to the squad car and finished issuing the driver a citation for driving without a license. Approximately 24 minutes into the stop, Simmons asked the driver if he had any questions and told him to "take care." After asking for directions to the nearest McDonald's restaurant, the driver then exited the vehicle.

Before the driver was able to reenter his own vehicle, however, Trooper Simmons also exited and called out to the driver. Simmons asked the driver if he had any drugs or weapons in the vehicle. Simmons then asked the driver for permission to search the vehicle, and permission was granted. The driver then returned to the squad car and signed a written consent to search form provided by Simmons.

After obtaining the driver's consent to search, Simmons approached the passenger side of the subject vehicle and opened the passenger door. There is no audio recording of this encounter.[3] After approximately 18 seconds, Defendant got out of the vehicle and walked back to the squad car. According to Simmons, he told Defendant that the driver had consented to a search of the vehicle. In response to questioning, Defendant told Simmons that he had two bags in the back. Simmons testified that he asked Defendant if he could search the bags, and Defendant said yes.

Defendant also testified at the instant hearing. According to Defendant, Trooper Simmons asked what things belonged to him. Defendant said he had two bags and a phone, and showed Simmons the phone. According to Defendant, Simmons asked where the bags were located, and he told him in the back. Defendant denied, however, that

---

[3] The vehicle stop on April 7, 2011 was video recorded by a camera located in Trooper Simmons' squad car, and audio recorded by microphones on Simmons' person and in his squad car. A DVD of the video and audio recordings was introduced at the instant hearing as Government's Exhibit 1. Among other things, the video displays "M1" and "M2," apparently representing the two microphones. At counter number 2065, while the driver was signing the consent to search form, the "M2" display inexplicably goes off. While Simmons denied at the instant hearing that he turned his body microphone off, he conceded that the microphone was no longer working when he exited the squad car approximately three minutes later and approached the subject vehicle.

4

Simmons told him the driver had consented to a search of the vehicle. Defendant also denied being asked for consent to search his bags, or giving such consent.

While the search was being conducted, the driver was sitting in the front seat of the squad car, with Defendant sitting in the back seat. Their conversation was recorded by the microphone in the squad car. First, the driver and Defendant discuss the inconsistencies in the answers which they gave to Trooper Simmons' questions. Defendant repeatedly tells the driver that "I told him the bag is mine." Defendant asked the driver to "take care of my baby" and "visit me in jail." Defendant states that "he will find it." Defendant also says that "you don't know nothing, it's my bag." These statements were all made *prior* to the drugs being found in Defendant's bag.

Within a few minutes, officers found a package in a bag identified by Defendant as his. The football-sized package was placed on the hood of the squad car and cut open, revealing marijuana. Defendant stated "that's it for me, man." Later, Defendant tells the driver "they find it in my bag; they cannot do nothing to you." After being *Mirandized*, Defendant was asked whether the marijuana belonged to him. Defendant would not answer the question directly, instead stating repeatedly that "it's my bag." At the time of hearing, Defendant denied knowing the drugs were in his bag.[4]

## V. DISCUSSION

In his motion to suppress, Defendant asserts that he "did not give Trooper Simmons knowing and voluntary consent to search his bags." This argument requires the Court to determine whether consent was given and, if so, whether it was given voluntarily. Defendant also asserts in his motion to suppress that the trooper did not have probable cause to search his bags.

---

[4] A more thorough search at a DOT facility revealed methamphetamine and cocaine in the same bag.

5

## A. Did Defendant Give Consent to Search?

The Fourth Amendment protects persons and their property against unreasonable searches and seizures. A warrantless search is presumptively unreasonable. *United States v. Castaneda*, 438 F.3d 891, 893 (8th Cir. 2006). However, a voluntary consent to search is a valid exception to the warrant requirement. *United States v. Guzman*, 507 F.3d 681, 687 (8th Cir. 2007). The first issue in this case is a factual one: Did Defendant consent to a search of his bags?

Trooper Simmons testified repeatedly and unequivocally that he informed Defendant of the driver's consent to search the vehicle, asked Defendant to identify which bags were his, and then obtained Defendant's verbal consent to search those bags. Defendant confirmed that Simmons asked him what "personal belongings" were his, and Defendant identified the two bags in the back. Defendant denied, however, that he was told that the driver had consented to a search of the vehicle, or that Simmons asked for Defendant's consent to search his bags. Defendant specifically denied giving such consent.

Accordingly, it is necessary for the Court to weigh the credibility of the two witnesses. The Government notes that Trooper Simmons is an experienced trooper who has been assigned to a "drug interdiction team." Simmons knew that a vehicle could be searched only with probable cause or with the occupant's consent. Simmons admitted that following a traffic stop where he suspected criminal activity, he was "looking to find a way to search the vehicle." Here, Simmons testified that "I didn't see anything or smell anything, and so my next step was to ask for consent to search." Simmons conceded on cross-examination that he did not have probable cause to search the bags and could not have searched the bags without Defendant's consent.

According to Trooper Simmons, if a passenger refuses to consent to a search of their personal items, then he asks them if they are willing to wait for a K-9 to "free air sniff" the vehicle. Simmons admitted that even if they say no, he detains them and calls for the "closest available dog." In this case, Trooper Anderson – who appeared on the scene prior to the search – had a K-9 available. Simmons testified that if Defendant had

6

refused a search of his bags, then Simmons would have told Trooper Anderson to have his dog do a free air sniff of those bags. According to Simmons, none of that was necessary because Defendant had consented to the search.

Defendant asserts that the 18 seconds between Trooper Simmons arriving at the passenger door and Defendant exiting the vehicle was not enough time to seek and obtain consent to search the bags. According to Defendant, "[i]t is difficult to imagine how Trooper Simmons was able to get Mr. Khaleel's knowing and voluntary verbal consent in such a short time span."[5] Defendant also finds it suspicious that there was no audio recording of the encounter, nor did Simmons obtain Defendant's written consent. Simmons testified that he "typically" gets written consent from the driver "who is in the main control of the vehicles" and obtains verbal consent from the passenger.

I believe that Trooper Simmons is more credible on this issue. Telling Defendant that the driver had consented to a search of the vehicle, asking Defendant which bags were his, and asking for permission to search the bags, could be completed in 18 seconds. Simmons is an experienced trooper who specializes in drug interdiction on the interstate. It is likely that Simmons would have understood the importance of obtaining consent to search. A drug dog was at the scene and if consent was lacking, Simmons could have easily directed a "free air sniff" of the bags in an attempt to establish probable cause to search. This suggests that Simmons believed he had Defendant's consent.

Most persuasive on the issue of credibility, however, is Defendant's testimony at the hearing that he did not know there were drugs in the bag. This testimony is inconsistent with statements made by Defendant while in the squad car prior to the search. Before the drugs were found, Defendant told the driver that "I told him the bag is mine," "take care of my baby," "visit me in jail," and "he will find it." Defendant told the driver that "you don't know nothing, it's my bag." These statements are consistent with Defendant knowing that drugs would be found in the bag. If Defendant is willing to lie

---

[5] See Defendant's Brief (docket number 14-1) at 3.

7

under oath at the hearing regarding his knowledge of drugs in the bag, then it is likely that he is also lying regarding the issue of consent to search.

Accordingly, I find Trooper Simmons' testimony regarding Defendant's consent to search to be more credible. That is, I believe Defendant consented to a search of his bags. While Defendant's signature on a written form would have been helpful in establishing consent, it is not required. *United States v. Saenz*, 474 F.3d 1132, 1136-37 (8th Cir. 2007) ("Consent can be given orally or in writing, and it is not necessary to use a written consent form."). Having concluded that Defendant gave consent to search his bags, the Court must then determine whether the consent was given voluntarily.

### B. Was Consent to Search Given Voluntarily?

At the time of hearing, Defendant categorically denied giving Trooper Simmons consent to search his bags. In his brief, however, Defendant suggests that *if* consent was given, then it was not voluntary. As set forth above, I believe that Defendant consented to a search of his bags. For the reasons which follow, I also believe the consent was voluntary.

The Government bears the burden of proving by a preponderance of the evidence that the consent was given voluntarily. *United States v. Esquivel*, 507 F.3d 1154, 1159 (8th Cir. 2007). "A consent is voluntary if the consenting individual had 'a reasonable appreciation of the nature and significance of his actions.'" *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007) (quoting *United States v. Rambo*, 789 F.2d 1289, 1297 (8th Cir. 1986)). Stated otherwise, Defendant's consent was voluntary "if it was the product of essentially free and unconstrained choice, rather than the product of duress or coercion, express or implied." *United States v. Morreno*, 373 F.3d 905, 910 (8th Cir. 2004). The Court must view the totality of the circumstances and determine whether the "pressures exerted upon the suspect have overborne his will." *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989). Factors to be considered include the "characteristics of persons giving consent" and "the environment in which consent is given." *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990).

In his brief, Defendant concedes that "[i]t is true Mr. Khaleel is an adult, was sober at the time of the search, and has a college education, which would indicate he was mentally and intellectually capable of granting consent."[6] However, Defendant notes that he is a refugee from Iraq, has only been in the United States for a short time, and English is not his first language. Defendant also asserts in his brief that "he had never been arrested before, and had little knowledge of the American criminal justice system." *Id.* at 4.

While English is not Defendant's first language, it would appear that he is fairly fluent in English. During his initial four-minute conversation with Trooper Simmons, Defendant appeared to understand English. When Defendant was placed in the squad car for the search, he communicated with the driver in English. The Court also notes that Defendant initially appeared in this Court without an interpreter. At the time of hearing, Defendant testified (through an interpreter) that at the scene, Trooper Simmons asked what things belonged to him, and Defendant answered Simmons responsively. That is, Defendant understood the question and answered accordingly. Defendant also testified that Simmons did not ask for or receive consent to search his bags. However, Defendant does *not* claim that he did not understand any part of his conversation with Simmons. Accordingly, while English is apparently not Defendant's first language, it did not interfere with his discussion with Simmons on this subject. *See United States v. Lopez-Mendoza*, 601 F.3d 861, 866 (8th Cir. 2010) (holding that consent given under similar circumstances was voluntary).

Even assuming that Defendant has only limited knowledge of the American justice system, that does not negate the voluntariness of his consent to search. While the Court must determine voluntariness from the totality of the circumstances, "awareness of the right to refuse is not necessary for consent to be voluntary." *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009) (quoting *United States v. Smith*, 260 F.3d 922, 924 (8th

---

[6] *Id.*

9

Cir. 2001)). Similarly, a *Miranda* warning is not required for a consent to search to be voluntary. *Saenz*, 474 F.3d at 1137 ("We have not required an officer to provide *Miranda* warnings before requesting consent to search or held that an absence of *Miranda* warnings would make an otherwise voluntary consent involuntary."). Furthermore, the "environmental" factors in this case suggest that the consent to search was voluntary: Defendant was not detained or questioned for a long time, he was not threatened or physically intimidated by the officer, there were no promises or misrepresentations made by the officer, Defendant was not in custody or under arrest when the consent was given, the encounter occurred in a public place, and Defendant did not object to the search as it occurred.[7]

In support of his motion, Khaleel cites *United States v. Escobar*, 389 F.3d 781 (8th Cir. 2004). There, the Court concluded that the district court properly found that the defendants' consent to search their bags was not voluntary. In *Escobar*, however, the officer falsely told the defendant that "a drug-sniffing dog had given a positive indication of drugs in her travel bag." *Id.* at 785. The Eighth Circuit Court of Appeals concluded that in doing so, the officer communicated to the defendants "there was probable cause to search and they had no choice but to permit it." *Id.* at 786. Here, Trooper Simmons told Defendant that the driver had given consent to search the vehicle – which was true – but made no statement inferring that he had probable cause to search Defendant's bags, or that Defendant "had no choice but to permit it."

After considering the totality of the circumstances, the Court concludes that the Government has met its burden of proving that Defendant's consent to search his bags was given voluntarily. Defendant was a sober adult of at least average intelligence. Defendant was asked for consent to search his bags, and he immediately agreed. There is no

---

[7] The Court in *Chaidez* suggested that courts should ask whether the person who consented: "(1) was detained and questioned for a long or a short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred." *Chaidez*, 906 F.2d at 381 (internal citations omitted).

evidence that Defendant did not understand the request, or that his consent was the product of any threats or intimidation. Because Defendant's consent to search the bags was voluntary, his motion to suppress on that ground should be denied.

## C. Was there Probable Cause to Search?

Defendant also argues in his brief that Trooper Simmons did not have probable cause to search his bags. As set forth above, I believe that Defendant voluntarily consented to a search of his bags. If the district court agrees, then it is unnecessary to address the issue of probable cause. However, if the district court concludes that Defendant did not voluntarily consent to a search of his bags, then it is necessary to determine whether Simmons had probable cause to search the bags.

At the time of hearing, Trooper Simmons candidly admitted that he did not have probable cause to search the bags and that he could not have searched the bags without Defendant's consent. The Government does not address the issue directly in its resistance to Defendant's motion to suppress. In arguing that Defendant consented to a search of his bags, however, the Government suggests that "the totality of the circumstances observed by Trooper Simmons, including defendant's and Guzman's conflicting accounts of their travel plans, their vague and conflicting descriptions of their relationship, Guzman's criminal history, and the unusual level of nervousness exhibited by both Defendant and Guzman, gave rise to at least a reasonable suspicion that defendant and Guzman were engaged in some criminal activity and that evidence of the criminal activity would be found somewhere inside the Yukon."[8] The Government does *not* argue, however, that these circumstances gave Simmons probable cause to search the vehicle. Instead, the Government argues that "[u]nder those circumstances he could have called for a K-9 unit to do a free air sniff of the car to confirm or dispel his suspicions that there was contraband (specifically, drugs) in the vehicle."[9] The Government argues that Simmons'

---

[8] *See* Government's Brief in Resistance (docket number 21-1) at 6.

[9] *Id.*

failure to call for a K-9 supports his testimony that Defendant had consented to a search of his bags.

It is doubtful under these circumstances that probable cause existed for a search of the vehicle. As noted by Trooper Simmons in his testimony, he "didn't see anything or smell anything." A drug dog was *not* used and, obviously, did not alert on the vehicle or its contents. I believe that the perceived "nervousness" by Defendant and the driver, and the conflicting accounts of their relationship and travel plans, standing alone, would not provide probable cause to search.[10] As previously noted, however, probable cause is not required when the owner of the property gives consent to search.

## VI. RECOMMENDATION

For the reasons set forth above, it is respectfully **RECOMMENDED** that the Motion to Suppress (docket number 14) filed by the Defendant be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on July 25, 2011.*

DATED this 2nd day of August, 2011.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[10] The Government cites *United States v. Foley*, 206 F.3d 802 (8th Cir. 2000). In that case, however, a drug dog was called and alerted to the vehicle. *Id.* at 805. The Government has not cited any case where probable cause to search was established by "nervousness" and inconsistent answers alone.

12